May it please the Court, Timothy Berg of Fenimore Craig on behalf of Appellant Jason Halpern. I'd like to reserve four minutes for rebuttal. This case involves a party who, after agreeing to enter into a joint venture under terms set forth in a side agreement, does everything he can to sabotage the potential joint venture by proposing terms that are inconsistent with the side agreement and by refusing to negotiate in good faith the terms of that joint venture. The issue before the Court today more narrowly is whether the district court properly granted summary judgment on Mr. Halpern's anticipatory repudiation claim, given that there were genuine issues of material fact concerning the terms of the side agreement between Mr. Halpern and Mr. Tharaldson and what they meant, and genuine issues of at least genuine issues of material fact. And I would contend there really aren't any that may go our way, but let's say genuine issues of material fact as to whether Mr. Tharaldson and his agents repudiated the agreement by their conduct. Let's assume that there is a repudiation here of the part of the agreement that says if you exercise the option, I'll enter into a joint venture. What do we do with the fact that the option wasn't exercised? I think, Your Honor, under the law of New York, once Mr. Tharaldson made it clear he wasn't going to negotiate in good faith and he wasn't going to perform his part of the bargain, Mr. Halpern was excused from tendering the $5 million. In order to agree with you, do we have to conclude that the terms that Mr. Tharaldson I hope I'm pronouncing that correctly, proposed were not commercially reasonable? No. I think if you — one, if you conclude your — Isn't that the language that was used? Your Honor, first, if you conclude they were inconsistent with the terms the parties had already agreed to in the side agreement, that would be a repudiation in and of itself. Secondly, if you were to conclude they weren't inconsistent with specific terms, but they were commercially unreasonable, that would be a repudiation. I think it's a repudiation either way. If I sign a letter with Judge Hurwitz saying we're going to do this, this, and this, he can repudiate that and then we're going to negotiate some other commercially reasonable terms. He can repudiate that contract either by rejecting the terms we've already agreed to and indicating he isn't going to perform them or by insisting on commercially unreasonable terms for the rest of our agreement. Am I correct that the dispute here is whether the 50-50 split of the proceeds from the sale of the property would be net of contributions or gross? More specifically, the question is would it be net of contributions to a previous partnership that wasn't involved in this transaction, which is what Mr. Farrellson wanted to do, or whether it would be based on the contributions they'd made to this particular joint venture, the LVNG joint venture, in which each of them had put $5 million, and it's $5 million plus a little bit in costs, but everybody sort of used the term $5 million, including the district judge. So it's slightly different. The question is does the PARI-PASU equal contribution, equal distribution provision say we've each put $5 million into this deal and, therefore, we're going to split everything equally, or does it allow Mr. Farrellson to say I want to be paid for all these monies I put into this prior investment partnership that isn't the partnership Mr. Halpern is now buying into? So, again, let's assume for a second that the proposed waterfall, if you will, is inconsistent with the PARI-PASU concept. Is the side agreement, as you call it, you know, not the option, but what will happen if the option is exercised, sufficiently certain to enforce? I mean, it says — and let me focus on the part of it that troubles me. It says, well, we'll share equally in decisions, and we'll share in profits and, I guess, losses, PARI-PASU. And it says, and then we'll also have a buyout in case we can't agree. What is who on what terms? Who gets to exercise it? Who gets paid? It strikes me that's a pretty vague provision. It seems to me you've got four definite provisions. One, you've got what Mr. Halpern has to pay to get into it. Right. The $5 million. You've got what the decision-making process is. All decisions will be made by agreement with Mr. Therrelson and Mr. Halpern. The third provision, the buyout provision, I think, Your Honor, says if, when we try to govern this thing by equal decision-making, if we come to the point where we simply can't operate because two people each having 50 percent of the vote, we just loggerheads, then we'll buy — one of us will buy the other out. Who? I think it gave either side the option to buy the other out at that point, Your Honor. At what price? Presumably — it isn't clear, but I think implicit in it was at the money that was put into the deal at least, plus any additional monies the parties had expended. Not at the current value of the property? Your Honor, I guess it isn't completely clear. And I guess my question is, because it isn't clear, do we have an agreement here that's sufficiently certain to enforce? I think you do, Your Honor, because the part of it we're asking you to enforce is clear. That's the Pari Passu provision, which says if we sell this property, Mr. Halpern gets half of the proceeds. And that's clear, and if it isn't clear, if it's ambiguous, there's contradictory test — or conflicting, pardon me, testimony on that point between Mr. Friedman  The trial court couldn't decide that on a motion for summary judgment. I would suggest, Your Honor, the court asked us to talk about the adjust-right case, and I would suggest to you the other way of looking at this is to look at adjust-right. Adjust-right says there are three kinds of agreements that you say you're going to document later. One is you negotiate all of the terms, and then you're just going to put it into a document. And our position would be this is pretty close to that, if not there. But secondarily, and maybe more importantly, it says the parties can agree to certain terms open to be negotiated later, and the other party, a party breaches that kind of agreement by refusing to negotiate in good faith or by doing something inconsistent with the explicit terms that have already been agreed to. Sotomayor What's the remedy when somebody refuses to negotiate in good faith over an unclear term? What does the court order? Well, I think here, again, Your Honor, we're not dealing with an unclear term. If we're here fighting about the buyout, then maybe that would be relevant. But my position would be the position, provision we're fighting about here is clear, and Mr. Therrelson, by insisting that that waterfall be in the agreement and telling Mr. Halpern he wasn't going to negotiate with him and he had only one option, and Mr. Cape telling them not to bother and he was going to make their life miserable, he repudiated that express provision, and that's enough to go to a jury and let a jury decide if it thinks that the provision means what we said it meant and whether Mr. Therrelson, in fact, repudiated it. I would have a hard time saying that. Roberts, are we now talking about your third cause of action? Your third cause of action seems to be that Mr. Therrelson failed to act in good faith. And so is that where we are? Are we talking about your third cause of action? I don't think so, Your Honor. I think what we're talking about here is anticipatory repudiation. We pled three claims, breach of contract, breach of the covenant of good faith and fair dealing, and anticipatory repudiation. And what I would suggest to you is that someone — if we enter into an option contract, you and I, and you then do something that — that takes away the benefit of my exercising the option for me, you've anticipatorily repudiated the deal. I'm entitled to enforce that. But the reason — if I can interrupt you — interrupt you. The problem here, which makes it a little bit more complicated, is you're not really alleging an anticipatory repudiation of the option contract. You're — what you're alleging is that an anticipatory repudiation of the joint venture contract that would follow the exercise of the option. Nothing here prevented you from exercising the option. Your Honor, we cite cases in both our opening and reply brief that say that that's not the correct analysis. For example, there was a case where someone had a right to enter into a lease. And one of the conditions of that lease was that they go get a liquor license. The other side didn't prevent them from getting a liquor license. But it said, we're not going to lease you the property anymore. What Mr. Theraldson did here is exactly the same thing. He didn't prevent Mr. Halpern from tendering $5 million. There's no dispute about that. What he did was say, you can give me $5 million, but — but — but I'm not going to fulfill the side agreement we have because I'm not going to enter into a joint venture. It's a side agreement that we ought to be focusing on, not whether or not there was an anticipatory repudiation of the option. Well, no, it's — it's whether there's an anticipatory repudiation of the side agreement. I agree with that, Your Honor. That's correct. If I said something else, I misspoke. And do you characterize the side agreement as the great Judge LaValle would — what the great Judge LaValle would call the binding preliminary commitment? I think it's at least that, Your Honor. I think there's an argument to be made that it's more than that, that it falls into the first category. But I — but I think it's at the very least a binding preliminary commitment to enter into a joint venture agreement containing the terms that are already in the side agreement and other terms. And what Mr. Therrelson had an obligation to do was comply with the terms he'd already agreed to and negotiate in good faith, and he did neither. And when he — in the — the failure to negotiate in good faith was the presentation of the waterfall and then saying, take it or leave it. Yeah. The waterfall — and not just take it or leave it, but Mr. Cape saying, we're going to make your life miserable if you keep negotiating, I won't negotiate anymore, Mr. Therrelson saying, take it or leave it, Mr. Therrelson admitting he really didn't give Mr. Halpern any options. I don't actually think there's a genuine issue of material fact about whether Mr. Therrelson repudiated this agreement. I think there's really no evidence going the other way. But if there were, even if a counsel can come up here and tell you these are all the things Mr. Therrelson did that are inconsistent with a repudiation, at the very least, we've presented enough evidence to go to a jury on this claim. Can we go back — and I know you want to save some time — go back to what the district judge found, and I guess here's my question. Do you have an obligation to put him to the test under these circumstances? Does the — does Mr. Halpern have to say, look, your position is crazy, I'm exercising the option, and if you don't agree to an agreement that's 50-50, I'm going to sue you, or does he — can he say, now you've indicated you're going to be — you may take a difficult position if I do exercise the option, so I'm not going to exercise  I think, Your Honor, under the cases we've cited in both our opening brief and our reply brief, when somebody indicates they're not going to follow through on their side of the agreement, you don't have to tender performance. None of those — none of those really deal with this sort of strange condition precedent circumstance. They do in a way, Your Honor. Again, look at the case I was talking about, about the lease, where I had an obligation to go get a liquor license. There was a case, and we've cited it in our brief, and I don't recall the name off the top of my head, and I apologize for that, where someone had a stock option, and he had to exercise the option in order to get the stock, and what the — and actually make a payment. I think it was $200,000 in the facts of that case. And the other — the company he had the stock option in canceled the stock option, said we're not going to give you that stock. I take your point, but those cases, and the reason I find them a little difficult, is they involve a party to the option, anticipatorily repudiating — you know, you exercise the option, doesn't matter, I won't let you do — I won't give you the thing that you bargained for. And that's exactly what happened here, what Mr. Cape and Mr. Theraldson said to Mr. Halpern and Mr. Friedman was, we don't care if you give us the $5 million or not, we're not going to enter into the deal that the side agreement says we're supposed to enter into. We're not going to negotiate commercially reasonable terms. Sotomayor, is that what you said? I think that's exactly what he said. Well, not in those words. What he said is, I'm going to make you agree to terms that are inconsistent with the deal we already have, and if you won't agree to those, we don't have a deal. I won't go any further. Would there — He didn't refuse to perform on the grounds that there wasn't a payment, Your Honor. He refused to perform on the grounds that he didn't like the deal that Mr. Cape had struck with Mr. Halpern and Mr. Friedman. Would there have even been a project if Theraldson had not paid $10 million to release the personal guarantees on them both? It is clear, Your Honor, that someone had to buy the loan, the note, the loan. Mr. Theraldson did that. Mr. Halpern had a right to buy half of that note for $5 million under commercially reasonable terms with pari passu equal distributions. Mr. Theraldson repudiated that obligation, and Mr. Halpern didn't have to do anything more. He was entitled to sue for anticipatory repudiation, either under the cases we suggested to you or under the adjust-right case. I'd like to save my last minute and a half for a rebuttal, if I can. Thank you. You have it. Thank you. Thank you. Ms. Gomez. May it please the Court, Christina Gomez arguing on behalf of Gary Theraldson. This case presents three issues of contract law, but let me first say what it's not. Of New York contract law. Of New York contract law, correct. I know. Right. That's why we're all struggling. And that's why you're referring us to Second Circuit law. We brought a New York guy with us. So let me tell you what it's not about. It's not about an agreement to agree on the terms of a possible joint venture, and it's not about an option agreement that was rescinded before it could be exercised. The side letter agreement allowed Halpern to purchase a 50% interest in LVNG, the entity that owned the senior loan, for a specific price. If, and only if, he exercised that option and bought his 50% interest in the entity, would the parties then be joint ventures and need to agree on the terms of their joint venture. So these two contracts, these two agreements are just completely separate? I mean, you already know at least some of the important provisions for the second agreement, which is you put in an equal amount, you get out an equal amount. That's a, and you have equal voting. Those are pretty important provisions, aren't they? Well, I guess there's a few questions within that. I mean, the first is they are two parts. It's in stages. It's you, the language of it, you shall have a right to acquire up to a 50% interest in the loan provided that you do X, Y, and Z. It didn't say provided that you pay in, you give us written notice, and we agree on all the terms of the joint venture agreement. It says if you pay in, then you're a 50% owner. Whether we agree on the terms of a joint venture agreement or not, he would have owned half of that entity, and maybe, which is an LLC. They fall under just generic New York LLC law. If they can't agree on the terms of a joint venture, that happens all the time. So what you're saying is that what Mr. Halpern should have done was exercise the option, become a 50% owner, and say to Mr. Thurlton, to hell with your waterfall. It's not part of the joint venture. Now a 50% partner in a joint venture, under New York law, I can make 50% of the decisions, and under New York law, I get 50% of the profits and losses, and your obstinance in not signing an agreement will make no difference. Is that your position? Yes, and this is exactly what his agent, Freedman, told him to do in May of 2015. He said, we are perfectly within our rights to, quote, exercise the option and send a document to them that we would be willing to sign. That was page 412 of the excerpts of record. He said, this is what we can do. Two can play this game. He can negotiate what terms he wants. Well, let's exercise the option, and then we can negotiate the terms that we want. But he first needed to buy in, and once he bought in, they're partners. They've got to reach some kind of agreement. Well, they don't have to, and see, that's what Mr. Berg says. Look, I wouldn't really, my client really didn't want to risk that. He didn't want to just be in a partnership with somebody who didn't agree with him on anything. He, we had a preliminary agreement, and that agreement said, not only will we enter into this partnership, but we'll share equally in decision making, and we'll share equally, para pasu, in the cash flow and profits, and we will, and your client said, no, I'm not willing to do that. And so, why doesn't he say at that point, look, I don't want to buy into a fight. I had a deal. Well, he, I mean, he could have just walked away if he thought, well, this isn't going to work, but what he should have done is bought in and then sort things out. But I'm going to answer the other piece of that, and it gets to the other piece of the question you were asking a moment ago. It's just the assumption that these terms, the para pasu, meant only specifically for this, this piece of this larger puzzle. At least on the face of it, that's what it seems to mean. You say it means something different, but isn't there at least a fact question about what it means? What it, what it basically means, well, if you're asking, is there an ambiguity in that, do you have to figure that out, it just means if the parties didn't make clear in that, then that's, you can't, you can't anticipatorily breach it. If you're, if, if, if the terms that Mr. Theraldson and his, the parties, his agents were offering were not very clearly inconsistent, then it's not an anticipatory repudiation. Those are terms that hadn't been totally clarified up front. And, and I'll also point to the other piece of the question. Aren't they clear on their face? What you seem to be saying is that even though anybody reading this would say we're going to share 50-50 in the, in the joint venture, there was a side understanding that your client could, could recover something first. No, not a side understanding. And I'll, I'll point the, the Court to the language in the little letter I. All decisions in governance with respect to the loan purchaser, the loan, the property, the budget, the business plans, and all things in connection there with will require – I mean, basically, that's not the, the, obviously the Perry-Pissu comes in the little letter, the, the, the triple I, but it's an indication in there, we're not dealing just with this loan. We're looking at the property as a whole. And these two parties, both were earlier investors in this property. The only reason that Farreldson bought the loan to begin with was because of the $30 million guarantee that he was getting out of it. I don't, I don't know why, why you would make an assumption that then this, this new piece of the deal is going to completely ignore everything that came before it. That all of a sudden now, when he's over $7 million in and Halpern is $250,000 in, that he's going to agree that all of a sudden now everything he's put in before is wiped out and doesn't matter. But why isn't that a question of, it's a great argument, and it might be the right way to interpret this, but why isn't that a question of fact for a jury? Because we're looking at this in terms of an anticipatory repudiation and a preliminary agreement that, that didn't have all of the terms perfectly nailed down. But what if a jury were to find that that wasn't the, that wasn't the understanding of the parties, that your client would be able to recover his previous investments? Then wouldn't this be an anticipatory repudiation? Only if the contract, if, if this were a contract that had completely spelled out and, and had, had mentioned that all of our earlier investments in this property are irrelevant, we are going to foreclose on this loan. This is exactly how it's going to be. These are pretty vague terms. It was like, we're going to sit down later, once you've bought in, and we're going to sort out all of these pieces. So your position, as I understand it, is that this case is no more complex than this. The two parties were together on this property earlier on. The recession came along. It, the loan was foreclosed upon, or they weren't able to pay on it. And your client came up with $10 million to buy the loan, the effect of which was to release both sides from the personal guarantee. That's right. And, and your client is saying your price of participating in the new project is to come up with $5 million to make us even. Because I came up with $10 million to get us both off the hook. But it's. Is the case more complex than that? It, it, it, it sounds like you're not acknowledging the fact that it wasn't, this $10 million wasn't the first money they had invested in the property. He's already in over $7 million. But if your client hadn't come up with the $10 million, they would still be on the hook for the guarantees, correct? That's true, which were $30 million guarantees. Both of them. They both would. Right. Right. And the indication in the record was. But your client's position was the price of participating is to come up with, if you will, your half of the $10 million. Right. That I put in to save us both. Right. What's wrong with that? I mean, there's, there's nothing wrong with that, with saying he's got to pay his $5 million if he wants in on, on this, this part of the deal. And, and the waterfall was saying, we're no longer looking at what we were before, where we're, we're paying. Right. Maybe I won't go down that road. Let's go back to the original point, though, because now you've got me interested in this. Let's assume that Mr. Halpern exercises the option, pays in $5 million, and becomes a 50-50 partner in whatever the LLC is called. Can your client then demand that he be reimbursed for his previous investments? It's, it's open at that point in time. They're joint ventures. No, it's not. It's just so we just have 50-50 partners who own this loan. Because that's really the, that's really what they own. They own, right, the entity that owns the loan. They're a loan that's secured by the property. Uh-huh. Okay. And they each own a loan 50-50 and it's secured by the property. Does your client then have the ability to demand from, from Mr. Halpern that he reimburse him for prior investments? Well, he can say, we're not going to foreclose on this loan. They certainly, as, as venturers who, who both own, I mean, they're, they're, they're both part of earlier investments and the later thing. They can say, we're not, they can say we're not going to treat this as a $30 million investment. It's a partnership of joint venture. Uh-huh. That, in which each party owns 50% and whose assets are really a property secured by the loan. Uh-huh. I mean, securing the loan. At that point, that's all there is, isn't there? You don't get to bring in prior. Maybe, I mean, maybe, I, I suppose, we're not, we're not in that situation, unfortunately. Absolutely another agreement, though. You don't get to bring in prior history or do anything else. So, what you're saying is really that Mr. Halpern agreed to take less than a 50% ownership in this joint venture. It's hard. You can't, you can't just take out the fact that these were not third parties who had no, no involve, no previous involvement in this. Um, I mean, you, you can't just pretend like that, that piece of it doesn't exist. That they haven't been in this venture together for this period of time. And say, well, all of a sudden now, our client is this far in. And all of a sudden, he's going to say, sure, I'm going to give you an equal share of everything. Notwithstanding that I've been carrying most of the bill at this point in time. Before the date, when, let's, there's a, let's assume that the option, there's a date to exercise the option, just to make it easier. Up until the exercise of the option, does Mr. Halpern have any interest whatsoever in this property or loan? In this loan? No. No. He had none. Okay. And, and he, right, of course, we're here now because he had the option to. So since he has no, since he has no interest, what does all this prior history, why does all this prior history matter if he exercises his option to buy half the loan? It, well, it, it matters because that was the only reason why he was, he was being offered a piece of like the 50% interest in this sort of new stage of the, of the venture that they already had been in. Um, I'm not sure how else to answer that. Yeah. And my, I guess my, my, my question sort of flow from the, your opening where you said, look, if he did, if he wasn't happy, he should have exercised the option and we would have had a joint venture in which he had 50%. Right. And the answer is he would have had 50% of a joint venture at that point. I'm not sure your client gets to say, Hey, I know we have 50% of a joint venture, but I got a history. Would you give me $7 million first before we. Well, at that point, they never got to that point. They never got to negotiating it. Exactly. We don't know that, right? Exactly. And, and I'm going to use that maybe as a segue to answer one of the questions that, that you asked earlier was what's the remedy if you're in the good faith and fair dealing context. And also whether we're here on the third claim, which of course was dismissed and wasn't appealed. And part of the reason it was dismissed was because it was, it was overlapping with the claims that were there with what they never did was say, all right, we're suing for a breach of the duty of good faith and fair dealing. Because we had an agreement here that was an agreement to agree and we needed to work out all the open terms. And we never got to that point. The remedy for that under New York law and second circuit law is your, your out of pocket costs. It's not what the deal would have been because the problem is the court can't know exactly what the deal would have been like the buy in, buy out question. Exactly right. We don't know what prop, what amount it was. And if it was as, as my, my colleague answers here, well, you, maybe you could have gotten your 5 million in, in change back. Well, that's the position we're in. They never put that money in. So they, there's nothing to get back out. They've never alleged any out of pocket costs here. Nonetheless, if, if this turned out to be a, a contract to bargain in good faith, wouldn't it be a question for the jury as to whether or not there had in fact been good faith bargaining? What I'm, what I'm saying is, and I, I guess the short answer would be for all the reasons that we talked about before, it wouldn't be because the only way you get to a, a breach of that is if A, you're insisting on terms and B, those are, are clearly inconsistent with terms that have already been nailed down in the contract. And I don't think, I don't think we're there. The shorter answer, the question Judge Eaton's asking you, and I'm interested in your answer, is even assuming that were all the case, what you're saying is that all you get for the failure to negotiate in good faith are your out of pocket costs. You don't get the agreement. Right, right. And, and then what case do you, what case do you cite for that? This, we didn't cite in our briefs because we weren't going down this road, but there's a case L7 designs to second circuit case 647F3R419. If the court wants us to do any further briefing on this, I'm sure we, we could do that. Well, if you can submit a supplemental citation for that briefing. Okay, but maybe you could answer my question. Why, why would it not be a question for the jury whether or not the negotiations were carried out in good faith? I think because it, under the IDT case, it has to be, it has to be clearly inconsistent with the terms that are already nailed down. And I think we're not there. But I'm going to say, even aside from that, because there's no damages that are alleged with any kind of certainty, you can't, you can't get there. I mean, first of all, there's no out of pocket costs that were ever alleged. They didn't, they didn't pay those in. But secondarily, for all the reasons that we've already said in our briefing, I don't think you have to get to the hard contract issues. You can just say their damages are so speculative. And if I could just say one, just one thing I wanted to say. I guess that, nonetheless, why wouldn't it be a question for the jury? Most of the cases, if not all of the cases that we cited on that piece, on the damages question, were cases where New York courts had decided that issue as a matter of law. When there's no expert testimony, all you've got is the individual themselves just speculating, hey, I think we could have gotten there and I would have made this money. Oh, no, no, why wouldn't it have been a question, why wouldn't it have been a question? Oh, you're talking about on the first part, on the first piece of it? Yeah, why wouldn't it be, whether or not you negotiate in good faith, why isn't that a question for the jury? That's the, I go back to, the only thing I can go back to is the IDT case, which is the New York case that says. That there are any damages? If, no, that was, I'm sorry, that was not a damages case. That was, that's the case on the first issue, which is if you're not demanding things that are inconsistent with the contract, then that's not, there's just, there's no breach there. But how would you know if you didn't, if the, if there wasn't evidence and evidence taken in the jury trial? Well, I will submit that on the summary judgment record. You can't get there. But even if you had concerns about that, you can still affirm because the damages are speculative and we have several cases we've cited on that basis. Thank you. Mr. Burke, why don't we put two minutes on the clock since we took Ms. Gomez a little bit over time? Thank you, Your Honor. Let me start with the damages questions and there's two points I want to make. The first is, and we also didn't cite any of these cases because the, the adjust right case wasn't before us. But if you read the adjust right case, I believe you will find there are cases that say in, in, in breach of certain kinds of contracts under that second category, the agreement to agree on certain terms and then go on in the future. You can recover lost profits, not just out-of-pocket costs, and we'll submit a supplemental citation on that. Question of, are the damages too speculative? There is enough evidence here to go to the jury. You have two things. You have Mr. Therrelson's own waterfall showing that he estimated that the property would sell for, with water rights for $33 million and then he went around and deducted out of that. That's sufficient evidence to survive a motion for summary judgment. Second, you have the testimony from Mr. Friedman and Mr. Halperin that D.R. Horton was willing to buy the property for $24 million net of the water rights and perhaps a higher amount depending on how many, how many lots could be built. Again, jury can choose to believe that or they cannot do, but it's enough to get, get us by a motion for summary judgment. On your damages point, I was interested in this. It seems to me that the argument, that if, if, if the waterfall's right, which is part of your damages argument, or if at least the Horton deal is, is solid. I think we'd say the top line of the waterfall is right. Or that it's solid and your client put in his $5 million and the other side took out the $7 million first, how much would you have made? If you look at Mr. Therrelson's waterfall and take it as gospel, each side makes a couple hundred thousand dollars. And I don't think anybody would have put themselves to this kind of deal and this kind of expense to ultimately get a couple hundred thousand dollars down the line. That's part of what makes Mr. Therrelson's waterfall commercially unreasonable, as well as inconsistent with the side letter agreement, which is the more important point, I think. Thank you. Thank you, Your Honors. Thank both sides for their excellent briefs and arguments, and this case will be submitted. Recess. We're going to take a ten minute recess, and then we'll hear the last case on the calendar.
judges: Hawkins, Hurwitz, Eaton